UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA,

      v.                                                              **DECISION AND ORDER**
                                                             18-CR-195-RJA

JULIAN BEAVERS,

                                     Defendant.
_____

        In January 2021, the defendant Julian Beavers pled guilty to Count 3 of the 5-count Indictment (Docket No. 12), *i.e.*, possession with intent to distribute, and distribution of, heroin and furanyl fentanyl on or about November 21, 2017, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C), which carries a maximum of 20 years' incarceration (and no mandatory minimum).  With a Criminal History Category VI, the defendant is facing an advisory Guidelines range of 92-115 months of incarceration.  By pleading guilty, the defendant avoided the charge (Count 2) with the 20-year mandatory minimum sentence and a maximum of life, *i.e.*, possession with intent to distribute, and distribution of, fentanyl and acetyl fentanyl, causing serious bodily injury to E.R. on September 19, 2017, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C).

        However, in the plea agreement (Docket No. 98, ¶ 11), the Government reserved the right to argue for an upward variance under 18 U.S.C. § 3553(a) and/or an upward departure under Guidelines § 5K2.2 (physical injury policy statement), due to the drug overdose by victim E.R. on September 19, 2017, which the Government alleges was due to the defendant's distribution of controlled substances.  The defendant reserved

the right to oppose any such request by the Government for an upward variance/ departure.

Before the Court is the Government's motion (Docket No. 101) requesting an upward departure pursuant to Guidelines § 5K2.2.  The Government also moves for an upward variance pursuant to 18 U.S.C. § 3553(a).  Herein, the Court will only address the departure, and the parties may then later, on the date of the sentencing, argue their points about a possible upward or downward variance.  The sentencing is currently set for November 23, 2021, at 12:30 p.m.

The Advisory Guidelines range, as calculated by the U.S. Probation Office, with a total offense level 23 and Criminal History Category VI, is a range of 92 to 115 months (Docket No. 110, ¶ 88).  The Government is asking that the Court impose a sentence at the statutory maximum of 240 months of incarceration, which is a ten-level increase in the offense level, more than double the high-end of the advisory range.  The defense opposes the request (*see* Docket No. 99, pp. 13-18; Docket No. 112), and in stark contrast asks for a term of imprisonment of 60 months, 32 months below the low end of the advisory range.

The Court has carefully considered all the parties' submissions and arguments with respect to a possible § 5K2.2 departure, including oral argument that was heard on August 18, 2021; sentencing memoranda and attendant exhibits (*see* Docket No. 99, pp. 13-18, and Docket Nos. 101, 107, 112, 114, and 119); the Government's supplemental submissions addressing the Court's questions set forth in its Text Order at Docket Number 120 (*see* Docket Nos. 124 and 125); and any other submissions made in relation to the Government's motion.

Upon due consideration of the foregoing, and for the following reasons, the motion is hereby GRANTED in part and DENIED in part, in that the Court concludes that it will upwardly departure pursuant to § 5K2.2 but that a lesser departure than what the Government is requesting is appropriate.

## STANDARD

As the Second Circuit recently reiterated, "the standard of proof for the district court's factual findings at sentencing, including when considering a departure under U.S.S.G. § 5K2.1 based on uncharged conduct, is a preponderance of the evidence . . . A district court should, however, take into consideration the degree of proof satisfied beyond a preponderance when exercising its discretion to decide whether and how much to depart."  *United States v. McCray*, No. 20-2545, 2021 U.S. App. LEXIS 22478, *18 (2d Cir. July 29, 2021), citing *United States v. Cordoba-Murgas*, 233 F.3d 704, 709-710 (2d Cir. 2000).  In other words, the preponderance of the evidence standard triggers the upward departure, but the extent of the departure will be reviewed for how compelling the evidence is.

Moreover, "[i]n determining the relevant facts, sentencing judges are not restricted to information that would be admissible at trial . . . [Rather, a]ny information may be considered, so long as it has sufficient indicia of reliability to support its probable accuracy . . . Reliable hearsay evidence may be considered . . . [while u]nreliable allegations shall not be considered."  § 6A1.3, comment.

Guidelines § 5K2.2 (physical injury policy statement) reads, in pertinent part:

> **If significant physical injury resulted, the court may increase the sentence above the authorized guidelines range.  The extent of the increase ordinarily should depend on the extent of the injury, the degree to which it**

3

**may prove permanent, and the extent to which the injury was intended or knowingly risked.** When the victim suffers a major, permanent disability and when such injury was intentionally inflicted, a substantial departure may be appropriate. If the injury is less serious or if the defendant (though criminally negligent) did not knowingly create the risk of harm, a less substantial departure would be indicated (emphasis added).

### **FACTS**[1]

The proof shows that the victim, E.R., and Witness 1, both drug addicts, became acquainted with each other in 2017 when E.R. was looking for heroin. Witness 1 then connected E.R. with her dealer, who they both knew as "Ock", and who they both identified as the defendant, Julian Beavers. E.R. and Witness 1 testified that almost every day they went together to purchase drugs from the defendant, specifically, a bundle of heroin apiece (10 bags of heroin constituted a bundle), for $60 or $70 per bundle. At some point, E.R. purchased the defendant's phone number from Witness 1 so that she could contact the defendant directly.

An FBI 302 report supplied by the Government describes extensive communications between the defendant, and both Witness 1 and E.R., namely, hundreds of calls and/or text messages. However, as noted by the defendant, the call detail records referenced in the report do not cover the timeframe of the overdose (September 19, 2017), as there is a gap in documented communications between July 5, 2017 and October 19, 2017.

On the date of the overdose, September 19, 2017, E.R. and Witness 1 bought drugs from the defendant as usual. They then went to Witness 1's house. At this

---

[1] Unless identified otherwise, these facts are taken from the redacted grand jury transcripts and FBI 302 report that the Government filed under seal as Exhibits A through E to its motion. *See* Docket No. 107.

4

juncture, there is some conflicting testimony, in that E.R. recalled Witness 1 using the drugs from the defendant first, and then warning E.R. to "be careful" because they felt "a little stronger". Witness 1's account did not mention any such warning, while one of the responding officers testified that Witness 1 said she was "going to do [the drugs], too, until [she saw her] friend fall on the floor. Otherwise, there would have been two of [them]."

Nevertheless, when Witness 1 observed the overdose and the appearance of E.R., she called the police, who responded to the scene.[2] All that E.R. recalled was having used two or three bags of the drugs, and then waking up to policemen surrounding her who relayed that she had been given Narcan three or four times. Witness 1 testified that she observed E.R. doing the drugs, and then within about five minutes "she was pretty much blue". E.R. fell off the chair she had been sitting on and Witness 1 caught her, placing her "flat on the floor." E.R. "was turning blue, [and] her lips were very blue", and her "breathing was really shallow." To Witness 1, she was "really deathly looking."

These observations about E.R.'s appearance at the time of the overdose align with those made by the two officers who responded to the scene, *i.e.*, that E.R. was on the floor and "unconscious" or "passed out", not moving at all, with a "grayish sort of complexion" and "sweaty pallor" that is consistent with an overdose. Her breathing was "very slow[ ]", which Office James Wolfe called "agonal respirations where there is nothing for several sections" and then she "gasp[ed]" for air. Her pulse was "weak . . .,

---

[2] Emergency Medical Services ("EMS") responded as well, but they arrived between the second or third dose of Narcan was administered and before they had unpacked their gear, and E.R. was revived before EMS administered any treatment to her.

fluttery [and] rapid".  Officer Wolfe stated that E.R.'s risk of injury or death was "imminent".  In addition to using the respirator on E.R. to help her breathe, three doses of Narcan were administered via a syringe into E.R.'s nostrils.  Between each dose, after awaiting a response for a minute or two, further doses were given until she reacted and "sprung awake . . . like an alarm clock went off", which is "common" in this situation.

E.R. was then taken to the hospital and admitted due to the overdose, and she was there for approximately a couple hours before she was discharged.  At the hospital, she appeared in no apparent distress and her respiratory and cardiovascular systems were deemed normal.  Acetaminophen and Ibuprofen were administered.  E.R. disclosed to medical staff that she was taking what appears to have been a prescribed medication, Clonazepam, for her mental health issues.  Upon discharge, E.R. went home.  The next day, she and Witness 1 again purchased more heroin from the defendant.

Witness 1 was "sure" that the drugs E.R. used when she overdosed came from the defendant.  Likewise, E.R. testified unequivocally that the drugs she overdosed on were the drugs she bought from the defendant.  In addition, the laboratory report for the seizure of controlled substances from the date of the overdose (glassine envelopes of heroin from a purse on the scene) confirmed that the substance contained fentanyl and acetyl fentanyl.  The defense concedes "it is undisputed that, at the time of the overdose, the narcotics found in E.R.'s purse contained fentanyl and acetyl fentanyl."

The Government has also submitted an affidavit (Docket No. 124-1) from Dr. Gale Burstein, the Commissioner of the Erie County Department of Health, who avers that Narcan is "designed to rapidly reverse the effects of any opioid including heroin,

fentanyl, or analogues of fentanyl", and that Narcan would have no effect on overdoses from non-opioid drugs such as methamphetamine, cocaine, or, as pertinent here, benzodiazepines (such as Clonazepam).  Dr. Burstein further avers that an individual suffering an opioid overdose who is "not discovered" and not provided Narcan "generally has about 8-10 minutes from the time he or she stops breathing until serious, irreversible brain damage develops."

## **DISCUSSION**

The Court concludes that E.R. suffered a "significant physical injury" from her non-fatal drug overdose, under Guidelines § 5K2.2.  This term is not defined in the Guidelines, and the Second Circuit has not addressed this issue.  However, there is out-of-Circuit case law that serves as instructive in that Courts have found a significant physical injury where a victim suffered a non-fatal overdose.  For example, in *United States v. Campbell*, No. 17-6000, 2018 U.S. App. LEXIS 30482, *6 (6th Cir. Oct. 26, 2018), the Court held that "[t]he district court did not err in concluding that non-fatal overdoses are significant physical injuries."  *See also United States v. James*, Case No. 20-12459, 2021 U.S. Dist. LEXIS 20501 (11th Cir. July 12, 2021) (per curiam); *United States v. Prince*, Case No. 17-6004, 749 Fed. Appx. 396 (6th Cir. Sept. 13, 2018); *United States v. Roberts*, 670 Fed. Appx. 901 (8th Cir. Nov. 23, 2016) (per curiam and unpublished).

From the record in this case, it is apparent that E.R.'s drug overdose was "temporar[ily]" life-threatening, but that she suffered no long-term effects.  In *Prince*, the Sixth Circuit held that in § 5K2.2, "as made clear in the policy statement, a lack of permanent injury does not negate an upward departure under § 5K2.2." *Prince*, 749

7

Fed. Appx. at 401.  In other words, even when an injury is "temporary or unintentional", the section may apply, but that situation would "warrant a lesser departure." *Id.* at 400. As in *Prince*, there is proof that "supports the necessity of medical attention." *Id.* at 399.

The Court also finds by a preponderance of the evidence that the defendant provided the drugs that caused E.R. to overdose.  The defendant argues that certain inconsistencies render the testimony of E.R. and Witness 1 unreliable such that their testimony should not be considered by the Court.

To be sure, there are a number of inconsistencies in their testimony, to include (1) the exact cost of the drugs obtained from the defendant, (2) the timeline of when E.R. and Witness 1 purchased drugs together from the defendant and when E.R. began to communicate directly with the defendant, (3) whether they used drugs together at Witness 1's house on any occasion (or occasions) other than the date of the overdose, and (4) whether Witness 1 did drugs the date of the overdose and warned E.R. about the strength of the drugs before E.R. took them.

The Court does not find, however, that these inconsistencies render the entirety of E.R.'s and Witness 1's testimony incredible.  As the Second Circuit has iterated, "a factfinder who determines that a witness has been inaccurate, contradictory and even untruthful in some respects may nevertheless find the witness entirely credible in the essentials of his [or her] testimony."  *McCray*, 2021 U.S. App. LEXIS 22478 at *17 (internal quotation marks and citations omitted).

The Court finds that the testimony by E.R. and Witness 1 concerning the circumstances of the drug overdose largely mirrored each other.  Moreover, critically,

E.R. and Witness 1 both testified, with no apparent hesitation, that the drugs on which E.R. overdosed were the drugs she purchased from the defendant that same day.

The defense further argues that Witness 1 and E.R. are incredible because they testified that the day following E.R.'s overdose, they bought drugs from the defendant as they did every day prior, and E.R. continued to purchased drugs from him every day following that.  In other words, the defense appears to question how an individual who has had a near-death experience could return to the same, self-destructive behaviors the very next day.  However, this argument disregards the nature of addiction, and how the actions *of an addict* may appear irrational to a non-addict.

As to causation, the defense also argues that a host of other drugs were found in E.R.'s system, according to a forensic toxicology report—including drugs that, when combined, are known to cause overdoses.  The defense reasons it therefore cannot be proven that E.R.'s overdose was the result of fentanyl, and not the other substances present in her system at the time of the overdose.  Exhibit B of the defendant's sentencing memorandum, at Docket Number 99, p. 62, is the first page of a forensic toxicology report showing test results of multiple controlled substances, including benzodiazepines, cannabinoids, and opioids.

However, as clarified by the Government, there is no toxicology report from the date of the overdose.  Rather, the report attached to the defense papers was from when the defendant was arrested in January 2018 for driving while impaired by drugs, criminal possession of a controlled substance, and possession of a hypodermic needle, not from the date of the overdose that was about three to four months earlier.

Moreover, E.R.'s hospital records from September 19, 2017, which the Government has provided *ex parte* and under seal (Docket No. 125), reveal that E.R. told medical personnel at the hospital that she was taking Clonazepam.  Despite the fact that there was another drug in her system at the time, Dr. Burstein averred in her affidavit that Narcan reverses the effects of any opioid, including heroin, fentanyl, and fentanyl analogues, but would have no effect on overdoses from other drugs, like Clonazepam.  As such, it can be reasonably inferred that the successful use of Narcan, and E.R. being revived immediately upon the administration of the third dose to her, shows that an opioid was responsible for her overdose.

It is speculative on this record to infer from a report from an incident months after the overdose that E.R. suffered a multi-drug intoxication on September 19, 2017.

A case out of the First Circuit, *United States v. Pacheco*, 489 F.3d 40 (1st Cir. 2007), is instructive on the issue of causation.  In that case, the proof showed that the victim had ingested both ketamine and heroin on the date of the overdose.  The defendant did not dispute that the victim's injuries were significant but argued that the evidence was insufficient to prove that the victim's significant physical injuries resulted from ketamine that he had supplied (as he did not supply heroin).  The First Circuit reasoned that in circumstances where there is more than one harmful substance in a victim's system and the defendant supplied only one of those substances, § 5K2.2 may still apply.  The Court held that the totality of the evidence in *Pacheco* was sufficient to support "an inference that ketamine, either by itself of in the combination with heroin, played a meaningful role in the overdose (and thus, in the incidence of the injuries)." *Pacheco*, 489 F.3d at 47.

The defendant advanced a related argument in *Pacheco* that the evidence was too weak to prove that he supplied the ketamine that resulted in the near-fatal overdose, rather than some other source. The First Circuit rejected that theory, and held, "it is possible that [the victim] had other sources of ketamine available to him. But the record contains no proof of that conjecture." *Pacheco*, 489 F.3d at 45.

Here, there is no proof that E.R. overdosed on anything other than the drugs supplied by the defendant. She was questioned whether she ever bought drugs from anyone else, other than the defendant, and testified that the defendant did send her to purchase drugs from his cousin. This occurred on only one occasion, however, when the defendant said he was not available. There is also no proof that E.R. was purchasing drugs from any other supplier. Furthermore, there is no proof that the E.R. consumed any additional controlled substance, other than the Clonazepam, which was previously addressed.

The defendant likens this case to *United States v. Tessina*, 15-CR-130, 2017 WL 6345400, 2017 U.S. Dist. LEXIS 204598, *24-30 (W.D.N.Y. Dec. 12, 2017), in arguing that there are "gaps" in this case that the Court should not fill in, and that the evidence is insufficient for an upward departure. In *Tessina*, Judge Vilardo held that, although it was a "close call", the Court could not conclude by a preponderance of the evidence that the victim's death resulted from the defendant's conduct, and thus declined to apply § 5K2.1 for a resulting, upward departure. *Id.* at *29-30.

The *Tessina* Court noted the "holes" in the proof, including the lack of any direct communication between the defendant and the victim, the lack of any express request by the defendant to sell drugs to the victim, and the absence of signature packaging

known to be used by the defendant and the individual who purchased drugs directly from the defendant.  Moreover, the Court repeated the fact that the victim did not have any heroin in his system when he died, and fentanyl was the sole cause of his death (and there was "no evidence that [the defendant] ever sold pure fentanyl—and good evidence that he sold a heroin and fentanyl mixture").  *Tessina*, 2017 U.S. Dist. LEXIS 204598, *24-30.

Additionally, also in contrast to the instant case, in *Tessina* the defendant was source of supply for the drugs, while his co-defendant was the distributor to the victim.  The co-defendant also testified that he bought the drugs indirectly from the defendant, and that it was his friend who was the direct purchaser.  Here, there is testimony from the victim and the witness who purchased drugs directly from the defendant, daily and for months, along with testimony that the drugs used by E.R. that resulted in the overdose were purchased that same day from the defendant.

Yes, there are some aspects of the Government's proof that are not as strong.  For one, there is no DNA evidence linking the defendant to the drugs at issue, as his DNA was excluded from the drug packaging that was submitted for testing/ analysis.  Second, while the Government has put forth an exhibit showing hundreds of phone communications between the defendant and Witness 1, and the defendant and E.R., there are no documented phone communications from the timeframe of the overdose.

The Court has taken these shortcomings in the Government's proof into consideration in determining the extent of an upward departure, but it does not conclude that they render the Government's proof so weak that the Government has not met the applicable standard.

Again, in finding a significant physical injury here, that is only the starting point. The Court has further assessed the appropriate extent of the departure based on the evidence and the factors laid out in § 5K2.2, which are, to reiterate, "the extent of the injury, the degree to which it may prove permanent, and the extent to which the injury was intended or knowingly risked."

The Government concedes that it has never argued that E.R. suffered a permanent injury. Rather, the Government argues that "the extent of the injury from an overdose is significant regardless of permanency." This somewhat misses the point, however, as the Court has found that E.R.'s injury *was* significant and that is no longer in question. Moreover, this only goes to one of the three factors that the Court considers regarding how far to depart.

What is clear from the record is that E.R. required reviving by Narcan. E.R. was observed during the overdose by Witness 1 and the responding officers, on the floor and unconscious, struggling to breathe, and with a weak pulse, as was described in detail above (*see supra*, pp. 5-6). In addition, the expert affidavit helps to establish that the overdose was life-threatening.

This Court has reviewed any remaining arguments by the parties in relation to the upward departure and finds that no discussion of those is necessary to its analysis and decision.

The Court concludes that, based on its reasoning as to the parties' various arguments, and its evaluation of how compelling the evidence is in relation to the significant physical injury in this case, that a three-level upward departure pursuant to § 5K2.2 is warranted. Assuming, *arguendo*, that the calculations in the report are correct

as to the total offense level of 23 (before the departure) and the defendant's criminal history category calculated at VI, this departure results in a total offense level of 26 and a Guidelines range of 120 to 150 months.

## CONCLUSION

For the reasons stated herein, the Government's motion (Docket No. 101) is GRANTED in part and DENIED in part.  The Court concludes that a "significant physical injury" within the meaning of § 5K2.2 resulted from the defendant's drug distribution, and that it will upwardly depart pursuant to § 5K2.2.  However, a lesser departure than what the Government is requesting is appropriate.

Again, the Court has not yet considered any argument with respect to the adequacy of the defendant's criminal history, or any argument for an upward or downward variance pursuant to 18 U.S.C. § 3553(a).  The parties now have a starting point by which to make these additional arguments at the sentencing, which will proceed on **November 23, 2021 at 12:30 p.m.**

**IT IS SO ORDERED.**

      _s/Richard J. Arcara_
      HONORABLE RICHARD J. ARCARA
      UNITED STATES DISTRICT COURT

Dated:   October 19, 2021
        Buffalo, New York